UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

BRADLY S. MORRIS and
LORRIE A. MORRIS,

    Debtors.
_____/

Case No. 05-33874
Chapter 13
Hon. Walter Shapero

## OPINION IN CONNECTION WITH CREDITOR LEPAK & ASSOCIATES' MOTION TO DISMISS CHAPTER 13 CASE

This matter is before the court on the motion of Lepak & Associates, (hereinafter "Lepak"), the principal creditor in Debtor's Chapter 13 case, to dismiss Debtors Bradly and Lorrie Morris's (hereinafter "Debtors") Chapter 13 case for cause pursuant to 11 U.S.C. § 1307(c) and § 1325(a)(3) on grounds their Chapter 13 petition was not filed nor their plan proposed, in good faith. For the reasons indicated, the Court is deferring its ruling.

### FACTS

Debtor Lorrie Morris was formerly employed by Lepak. Lepak alleges that she was fired when it found she was embezzling money from the company. On July 12, 2005, Lepak filed a civil action in Genessee County, Michigan Circuit Court, entitled, *Lepak & Associates, P.C. v Lorrie A. Morris and Bradley S. Morris*, Case No. 05-81831, seeking damages from Debtors in an amount exceeding $280,000, alleging embezzlement in at least that amount. Debtors had not answered that Complaint before this bankruptcy was filed.

Their Chapter 13 petition was filed on August 2, 2005. According to their Schedules, Debtors' asset situation was (1) they jointly owned a residence which they valued at $171,000 on which there are two mortgages totaling some $169,000, (2) they owned personalty, the total value of which was some $29,000, which includes three vehicles valued at about $24,000 (on which there

appear to be liens of some $17,000), and two current paychecks and an accrued tax refund totaling some $4,000. Debtors' unsecured nonpriority liabilities total about $306,000, $280,000 of which is Lepak's claim and $25,000 of which are credit card claims on about eight different credit cards. Their combined monthly incomes total $5,211.69 and expenses total $3,030, leaving $2,181.69 to be paid monthly into their plan, which provides, among other things for monthly payments to be made to their secured creditors. The chapter 13 plan worksheet indicates that over the three year proposed period of the plan, slightly less than $10,000 will be paid to the unsecured creditors and $78,000 to secured creditors.

Lepak's eight count state court complaint essentially alleges that Debtor Lorrie Morris was employed by Lepak as its office manager for a number of years prior to February 2005 when she was dismissed; that starting in 2003 or sooner she embezzled funds of Lepak by manipulating its books and depositing to her personal accounts payments made by Lepak's patients to Lepak and otherwise engaged in actions resulting in fraudulently purloining Lepak's funds. The complaint also alleges Debtor Bradly Morris, the husband of Lorrie, aided and abetted Lorrie and otherwise knowingly participated in her alleged fraudulent activities. On their face at least, Debtors' Schedules do not appear to list any sums or assets which could be inferred to have been the fruits of the claimed embezzlement. Lepak initiated discovery efforts directed in large part into an inquiry into Debtors' bank accounts and the source of any deposits and various questions and answers which might lead to a conclusion or inference that the claimed embezzlement in fact took place and a lack of any explanation of what happened to the embezzled funds and why the Schedules and/or Statement of Financial Affairs appear not to reflect in any way any receipt or disposition of the claimed embezzled funds. Lepak further asserts that in addition to its civil suit its claim has been placed

before the state prosecuting attorney for possible criminal charges no word on which had been received at the time of the hearing before this Court.

Specifically as pertains to the indicated discovery, Lepak moved for a 2004 examination of Debtors which was held on December 8, 2005. During that examination both Debtors asserted their Fifth Amendment privileges to certain questions posed relating to Lepak's claim, though did forthrightly answer various other questions. Thereafter, Lepak moved to dismiss the case and to deny confirmation of the chapter 13 plan, arguing that pursuant to Section 1325(a)(3), Debtors' Chapter 13 case was filed in bad faith, and should be dismissed as well for cause pursuant to Section 1307(c), saying that this Chapter 13 case was filed only in response to, and was merely an attempt to thwart, a possible state court judgment on the embezzlement claim. Debtors responded to the motion to dismiss and evidentiary hearings were held following which briefs were filed and oral arguments heard.

Lepak argues that Debtors gave contradictory testimony regarding an inheritance they received and could not or would not speak to the origin of money that pre-petition went through their bank accounts that arguably exceeded their combined income. Lepak provided evidence of a number of checks made out to Lepak that were allegedly signed over to Lorrie Morris and/or deposited in her account — actions not authorized by Lepak. Lepak also contends that there was interest listed as income in the Debtors' 2004 tax return in the amount of $3,706 the source of which Debtors did not adequately account for, and that proper administration of the bankruptcy estate is materially impeded or prevented.[1] Lepak further argues that by virtue of the foregoing asserting

---

[1]Debtors did attempt to account for the interest payment in their post-hearing reply brief. This Court can only consider evidence that was properly submitted at the time of the evidentiary hearing. However, the Court would note that in the overall analysis, the matter of the interest

3

their Fifth Amendment privileges has prevented Debtors from making a full disclosure as provided by law. Debtors argue that whether or not Debtors or either of them committed criminal acts is not before this Court; that they have no money or assets that were not disclosed in their Schedules; that the emphasis Lepak puts on the alleged criminal acts in any event is misplaced, and would only be one of a myriad of factors used to determine whether this case was filed or the plan proposed in good faith; and that they are only trying to obtain a fresh start by filing this bankruptcy.

## DISCUSSION

As noted, Lepak argues on a number of fronts i.e,: dismissal for cause under § 1307(c) by reason of Debtors' assertion of their Fifth Amendment privilege; dismissal likewise for cause under § 1307(c) because the case was not filed in good faith; and dismissal and/or denial of confirmation of the proposed plan under § 1325(a)(3) because the plan was not proposed in good faith.

The applicable legal framework for the inquiry into such issues in this Circuit can be traced to *Alt v. United States of America*, (*In re Alt*), 305 F.3d 413, 419 (6th Cir. 2002), which involved a dismissal for cause under § 1307(c) for lack of good faith in filing a bankruptcy petition. In coming to its conclusion, the *Alt* court referred to a previous case, *Society Nat'l Bank v. Barrett* (*In re Barrett*), 964 F.2d 588, 591 (6th Cir. 1992). That latter case involved a § 1325(a)(3) inquiry and the Court in *Alt* listed some 12 factors articulated by the *Barrett* court as also being relevant to the § 1307(c) dismissal for cause inquiry. In addition, the *Alt* court relied on a Seventh Circuit Court of Appeals case, *In re Love*, 957 F.2d 1350 (7th Cir. 1992), which like *Alt* was a § 1307(c) case, that articulated a number of factors to consider, some of which were different than those taken from *Barrett*. In the course of its decision, the *Alt* court also stated: "given the more severe consequences,

---

income, however considered, does not affect the outcome of this motion.

4

the law also recognizes that 'the bankruptcy court should be more reluctant to dismiss a petition under Section 1307(c) for lack of good faith than to reject a plan for lack of good faith under Section 1325(a).'" *In re Alt*, 305 F.3d at 420 (*quoting In re Love*, 957 F.2d at 1356).

The following is a comparison of the factors articulated in and derived from the *Alt* case and the indicated sources:

| *Alt* factors taken from *In re Barrett* (which was a § 1325(c)(3) case) | *Alt* factors taken from *In re Love* (which was a § 1307(c) case) |
|---|---|
| 1. Debtor's income; | 1. Nature of debt including whether or not it is a dischargeable debt in a chapter 7 case; |
| 2. Debtor's living expenses; | 2. Timing of petition; |
| 3. Debtor's attorney fees; | 3. How the debt arose; |
| 4. Expected duration of chapter 13 plan; | 4. Debtor's filing motive; |
| 5. Debtor's sincerity for filing; | 5. How debtor's action affected creditors; |
| 6. Debtor's future earning potential; | 6. Debtor's treatment of creditors before and after filing; and |
| 7. Special circumstances such as high medical expenses; | 7. Whether debtor has been forthcoming with the court and creditors. |
| 8. Frequency with which debtor has sought bankruptcy relief; | |
| 9. Circumstances under which debt was incurred; | |
| 10. Amount of payment offered under the proposed plan; | |
| 11. Administrative burden on trustee; and | |
| 12. Statutory policy of construing provisions in favor of debtor. | |

It is important to note that the cases also say that the listed relevant considerations or factors are not exclusive, but rather guidelines assisting the Court in reaching its good faith or lack of good faith conclusions. As one compares the foregoing lists, it is evident there is, as *Alt* recognizes,

considerable overlap. It is also evident that some of the factors *Alt* derived from the § 1325(c)(3) *Barrett* are more relevant to, and weighty in, a § 1325(c)(3) situation than to a § 1307(c) situation — particularly items 3, 4, 7, 10, and 11, and to some extent 1 and 2.

Here, we have both statutory provisions asserted as the basis for court action and there are different ramifications involved. If the plan is found not to have been proposed in good faith under § 1325(c)(3) normally a debtor would then have the opportunity to propose one that might. Indeed a debtor might be able to do so depending on the reasons given for the bad faith finding and the debtor's total financial situation. If the petition is found not to have been filed in good faith under § 1307(c) in the first place and the case dismissed, unless circumstances might have changed, filing a new chapter 13 petition might prove to be problematic, though not impossible (unless the dismissal is with prejudice). Then too, § 1307(c) also allows for conversion as well as dismissal.

As this Court sees it this case comes down to the following: (1) but for Lepak's claim, the Debtors' situation is such that they might very well have been able to work their way out of their debts without filing bankruptcy given their other debts and income (though that is not at all clear), or more likely the situation is one which would at least survive a good faith challenge under § 1307(c); (2) the filing of Lepak's lawsuit in state court either precipitated or accelerated the Debtors' bankruptcy filing, as likely did a soon to be effective change in the law making Lepak's civil claim non-dischargeable even in a Chapter 13 case. In that regard, however, it should be kept in mind that many, many bankruptcy cases are precipitated by such events as imminent foreclosure sales, car seizures, previously obtained judgments in respect to which collection procedures such as execution or garnishments are threatened or in place; entry of a divorce judgment and/or credible threats of same. In each of those situations, the fact that the bankruptcy filing occurred as an

6

immediate and direct response thereto does not perforce mean the bankruptcy was filed in bad faith. The cases saying so, and requiring an inquiry as to all the facts, are legion. It should be further noted, in each of the referred to situations there is usually no argument about the mortgage or car loan default, the entry of the judgment, or the fact of the entry of the divorce judgment or other precipitating event, unlike this case where the claim is disputed or at least was not the subject of any extensive or dispositive pre-filing procedures resulting in a judgment or the like or an indication of the likelihood of same against the Debtors. Nor does a filing in the face of an imminent adverse to a debtor change in the law perforce provide a determinative ground for a bad faith determination; (3) the nature, amount, and existence of Lepak's claim has yet to be determined; in connection therewith, Debtors, or one of them has, asserted their Fifth Amendment privilege during discovery proceedings and there apparently is a criminal investigation pending which as of the hearings on the pending motion had not yet been completed or at least had not then resulted in any indictment or charge; (4) a dismissal (or even possibly a conversion[2]) under § 1307(c) would serve Lepak's apparent purpose since that would place the Debtors, (if they still wish to and can re-file for bankruptcy, and they wish to file a new Chapter 13 petition), in the position of Lepak's debt if proven being non-discharageable in any event; and (5) the Debtors' financial situation is also such, other than consideration of Lepak's debt on the process, that denying confirmation for lack of good faith under § 1325(a)(3) might not be appropriate given the recited facts as to their assets and income — such indicating that in terms of what the Schedules show in respect to said items, and assuming for purposes of argument that they have no other assets or assets emanating from the activities Lepak asserts in its claim.

---

[2]Conversion is a theoretical option no one has materially yet addressed.

In this latter connection, Lepak, in essence, also argues as noted that Debtors' Schedules are false because given the amounts it alleges Debtors fraudulently obtained from it and when those actions took place, the Schedules and Statement of Financial Affairs fail to properly account for same thus permitting the inference or requiring a conclusion they have retained the sums involved or converted them into other assets not listed on the Schedules, and, that is bad faith. Maybe that is so, but that too depends on whether or not Lepak can and does prove the embezzlement and fraud it asserts in the first place and consequent secretion. Unless and until it does so, the Court believes it should not in effect be decided in the context of the pending motion to dismiss. Furthermore if it is so, it would be in the interest of a trustee and all of the creditors to seek out the answers with the possibility of locating and obtaining additional funds for creditors, possibly and maybe preferably in the context of a conversion of this Chapter 13 case to a Chapter 7 case (rather than the asked for dismissal) where a case trustee could aggressively pursue the matter, i.e., as the saying goes "follow the money." That is wasted effort unless and until Lepak proves its claim. In a few words, the underlying crucial issues (which are separate but related) are (a) Did Debtors take the money?; and (b) If they did, what did they do with it?

The dynamic tension here is between the Sixth Circuit's statement that the Court should be more reluctant to dismiss under § 1307 than under § 1325 on the one hand, and the fact that consideration of the facts more relevant to a § 1307 dismissal create a very close call on the other hand — the tipping point being in this Court's mind, however, whether or not Lepak's claim and the basis for it are valid or not. One need also keep in mind that Lepak has the burden of proof to show bad faith in the § 1307 situation, but Debtor has the burden of proof to establish good faith in the § 1325 situation.

What is apparent is (a) the existence, nature, and amount of any debt owed by Debtors to Lepak is the lynch-pin and premise of any proper finding of lack of good faith under both statutory provisions or other grounds asserted for dismissal Lepak relies on and that includes assertion of the Fifth Amendment privilege;[3] (b) dismissal under § 1307(c) specifically requires the Court to determine whether or not such is in the best interest of <u>all</u> of the creditors, not just Lepak. If in fact Lepak's claim is found not to have merit or is in some minimum amount, the best interests of all of the creditors may very well favor continuation of the case as a Chapter 13 case as that would provide those creditors with some material return, as opposed to nothing which would likely be the case for instance in a chapter 7 situation in this case. To a very real extent, Lepak's argument does not fully take into account that its specific interests may not be the same as those of the rest of the creditors. Its apparent specific, and properly selfish, interest is making sure that its claimed debt is non-dischargeable, knowing full well that any payment it might receive on it during the Chapter 13 case would be relatively small if the debt is as large as it alleges. There are different ways Lepak can achieve that result without necessarily materially adversely affecting other similarly situated creditors and their potential payout. Regardless, it all depends, as noted, on the existence, nature, and amount of Lepak's claim.

---

[3] A dispositive issue in cases where dismissal is sought by reason of assertion of the privilege is whether or not the administration of the estate is materially adversely affected by that assertion; the chapter 13 trustee in this case has so far not said so, though that might be because the course of administration of this estate will change materially depending on whether or not or to what extent Lepak successfully proves it claim i.e., if it is proven, the trustee may wish to look at the adminstration of this estate and the assets available to creditors in light thereof; or if it is not, the administration will likely not be so affected; thus dismissal on this ground also depends in large measure on disposition of the Lepak claim. Indeed, even confirmation of Debtors' plan and incident thereto and commencement of payments under the plan, determination of whether, or what, to pay Lepak (before its claim is allowed), itself presents an administrative problem in this case, possibly justifying delay of confirmation pending such allowance, in any event.

The Court has therefore concluded that deciding the motion now, in favor of Lepak for instance, would be having this Court in large measure or effect also decide the merits of the claim (or at the very least introduce complex material collateral estoppel type issues on the matter arising from the very fact of such dismissal); but not in the context of a full and proper hearing where both Lepak and Debtors were given a full opportunity to have the merits heard and to present evidence directed to the merits of the claim and to properly and fully develop the context and specifics of, any assertions of the Fifth Amendment privilege. Should Debtors in connection therewith properly assert their Fifth Amendment privileges then Debtors would pay the price that their assertion of the privilege brings — a price which could include dismissal of this case. Dismissal now of this case on any of the grounds asserted, still leaves Lepak in the posture of having to prove its claim somehow, somewhere. What Lepak wants by way of dismissal now amounts to a request for an assurance that if it does prove its claim it will not have expended the time, effort, and costs of doing so in vain because of the prospect its claim will be discharged in this pending Chapter 13 case with only a small payment thereon. This the Court cannot and should not do under the circumstances and present posture of this case, any more than it can or should save the Debtors the time, effort, and costs of defending against the merits of the claim (and evaluating in the course thereof the effects, if any, of asserting the privilege) by prematurely denying the dismissal motion now and/or possibly confirming their proposed plan. Therefor, action on the dismissal motion should properly await disposition of Lepak claim on its merits, or pursuance of proceedings specifically designed for that purpose to such a point as will permit this Court to make a more knowledgeable and appropriate decision on the dismissal motions.

## CONCLUSION

The Court is therefore deferring its ruling on the motions to dismiss until such time as the existence, amount, and nature of Lepak's claim is further dealt with. That can be accomplished in at least two ways: (1) Lepak can ask this Court to lift the automatic stay to permit the state court civil action to go forward to that end; or (2) absent such a request, the Court can set up a claims determination procedure in this bankruptcy case for that purpose (possibly utilizing all or part of the evidence introduced in the hearings to date), but in any event providing all parties the due process rights to a full hearing, further discovery, etc., that the law requires. During the period either process (or some other similar and appropriate one) takes place, if a plan is not otherwise confirmed on a non-prejudicial (to the dismissal motion) basis, Debtors would be required to carry out their pre-confirmation Chapter 13 payment or other obligations, subject to whatever remedies (including dismissal) may exist should they fail to do so. Unfortunately in this case that could substantially delay confirmation, but this is one of those rare cases where such would be justified. A status conference will be held on **Monday, February 22, 2007** at **2:00 p.m.** to further discuss such matters.

**Signed on January 17, 2007**

                **/s/ Walter Shapero**
               **Walter Shapero**
               **United States Bankruptcy Judge**